Rel: August 29, 2025

**Notice:** This opinion is subject to formal revision before publication in the advance sheets of **Southern Reporter**.  Readers are requested to notify the **Reporter of Decisions**, Alabama Appellate Courts, 300 Dexter Avenue, Montgomery, Alabama 36104-3741 ((334) 229-0650), of any typographical or other errors, in order that corrections may be made before the opinion is printed in **Southern Reporter**.

# SUPREME COURT OF ALABAMA

## SPECIAL TERM, 2025

_____

### SC-2025-0275

_____

**Ex parte David Murl Spalding, M.D.; Vanessa Kay Hill, CRNP; and University of Alabama Health Services Foundation, P.C.**

**PETITION FOR WRIT OF MANDAMUS**

**(In re: Arlene Morgan and Daniel Morgan**

**v.**

**Maynor & Mitchell Eye Center, P.C.; Jennifer B. Martin, O.D.; University of Alabama Health Services Foundation, P.C.; David Murl Spalding, M.D.; and Vanessa Kay Hill, CRNP)**

**(Madison Circuit Court: CV-24-901651)**

---

**SC-2025-0283**

---

**Ex parte Maynor & Mitchell Eye Center, P.C., and Jennifer B. Martin, O.D.**

**PETITION FOR WRIT OF MANDAMUS**

**(In re: Arlene Morgan and Daniel Morgan**

**v.**

**Maynor & Mitchell Eye Center, P.C.; Jennifer B. Martin, O.D.; University of Alabama Health Services Foundation, P.C.; David Murl Spalding, M.D.; and Vanessa Kay Hill, CRNP)**

**(Madison Circuit Court: CV-24-901651)**

SELLERS, Justice.

These consolidated petitions for the writ of mandamus involve an action commenced by Arlene Morgan and her husband Daniel Morgan, alleging medical malpractice against various health-care providers. In case no. SC-2025-0275, University of Alabama Health Services Foundation, P.C. ("the Foundation"), David Murl Spalding, M.D., and Vanessa Kay Hill, CRNP (collectively referred to as "the Foundation defendants"), petition this Court for a writ of mandamus directing the

Madison Circuit Court to dismiss the claims asserted against them by the Morgans, based on the application of the limitations period or the period of repose set forth in § 6-5-482(a), Ala. Code 1975. In case no. SC-2025-0283, Maynor & Mitchell Eye Center, P.C. ("the Eye Center"), and Jennifer B. Martin, O.D. (collectively referred to as "the Eye Center defendants"), petition this Court for a writ of mandamus seeking the same relief as the Foundation defendants.[1] For the reasons explained below, we grant the petitions and issue the writs.

## I. Facts

On October 22, 2024, the Morgans commenced the underlying action against the defendants. In that action, Arlene asserted medical-malpractice claims against the defendants pursuant to the Alabama Medical Liability Act ("the AMLA"), § 6-5-480 et seq. and § 6-5-540 et seq., Ala. Code 1975, and Daniel asserted a claim of loss of consortium. The gravamen of the complaint is (1) that Arlene was prescribed

---

[1]According to the complaint, the Foundation employs Dr. Spalding and Hill and is, therefore, allegedly vicariously liable for the acts and/or omissions of those health-care providers. And, the Eye Center is Dr. Martin's practice group and is, therefore, allegedly vicariously liable for her acts or omissions.

3

Plaquenil, a drug that poses a risk of retinopathy or damage to the retina, which can lead to severe and permanent vision loss if timely cessation of use of the drug does not occur, and (2) that the defendants were negligent and wanton by failing to properly screen her for retinopathy while prescribing Plaquenil, by ignoring her medical history and symptoms, and by permitting her to remain on the drug, thus causing her to suffer permanent vision loss. The Foundation defendants and the Eye Center defendants filed separate motions to dismiss, arguing that the Morgans' action was barred by the limitations period and/or the period of repose set forth in § 6-5-482(a), which is part of the AMLA.[2] The trial court

---

[2]The Morgans filed a first amended complaint that included as exhibits medical literature regarding Plaquenil, as well a discussion of that literature in the complaint; the trial court did not exclude those exhibits. Because the medical literature is central to the Morgans' complaint and is referred to in the complaint, the motions to dismiss in this case are not treated as motions for a summary judgment, pursuant to Rule 56(c), Ala. R. Civ. P. See Donoghue v. American Nat'l Ins. Co., 838 So. 2d 1032 (Ala. 2002) (noting that, if an exhibit is central to and referred to in the complaint, its consideration does not convert a motion to dismiss into a motion for a summary judgment). The Morgans also filed a second amended complaint to substitute the Foundation for a previously named defendant, UAB Medicine Enterprise, which had been dismissed as an improper defendant. Because neither the first amended complaint nor the second amended complaint altered the material facts and allegations of the original complaint, the motions to dismiss were not moot. See Meadows v. Shaver, 327 So. 3d 213, 222 (Ala. 2020) (holding that an amendment of a pleading moots an opponent's pending motion

entered separate orders denying the motions to dismiss. These mandamus petitions followed, and this Court consolidated the petitions.

## II.  Standard of Review

> "A writ of mandamus is an extraordinary remedy available only when the petitioner can demonstrate: '"(1) a clear legal right to the order sought; (2) an imperative duty upon the respondent to perform, accompanied by a refusal to do so; (3) the lack of another adequate remedy; and (4) the properly invoked jurisdiction of the court."' Ex parte Nall, 879 So. 2d 541, 543 (Ala. 2003) (quoting Ex parte BOC Grp., Inc., 823 So. 2d 1270, 1272 (Ala. 2001))."

Ex parte Alabama Dep't of Corr., 252 So. 3d 635, 636 (Ala. 2017).

The Foundation defendants and the Eye Center defendants seek mandamus review of the orders denying of their motions to dismiss, which were filed pursuant to Rule 12(b)(6), Ala. R. Civ. P.  "The general rule is that, subject to certain narrow exceptions, the denial of a motion to dismiss is not reviewable by petition for a writ of mandamus." Ex parte Brown, 331 So. 3d 79, 81 (Ala. 2021).  However, this Court has permitted mandamus review of a trial court's order denying a motion to dismiss when it was clear from the face of a complaint that the claims asserted therein were barred by the limitations period or the period of repose set

---

only to the extent that the substance of the amendment moots the substance of the motion).

forth in § 6-5-482(a).  See Ex parte Hodge, 153 So. 3d 734 (Ala. 2014) (permitting mandamus review of a trial court's order denying a motion to dismiss when it was clear from the face the complaint that the plaintiff's medical-malpractice claim was barred by the four-year period of repose set forth in § 6-5-482(a)).

Regarding Rule 12(b)(6) dismissals, this Court has stated:

"On appeal, a dismissal is not entitled to a presumption of correctness. The appropriate standard of review under Rule 12(b)(6) is whether, when the allegations of the complaint are viewed most strongly in the pleader's favor, it appears that the pleader could prove any set of circumstances that would entitle her to relief. In making this determination, this Court does not consider whether the plaintiff will ultimately prevail, but only whether she may possibly prevail. We note that a Rule 12(b)(6) dismissal is proper only when it appears beyond doubt that the plaintiff can prove no set of facts in support of the claim that would entitle the plaintiff to relief."

Nance v. Matthews, 622 So. 2d 297, 299 (Ala. 1993) (internal citations omitted).

## III.  Discussion

The defendants argue that it is clear from the face of the complaint that the causes of action in this case accrued on October 24, 2019, when Arlene first discovered through testing that she had "definitive signs of retinol toxicity."  Thus, they say, the Morgans' action, which was

commenced on October 22, 2024, is barred by § 6-5-482(a). We agree.

Section 6-5-482(a) provides, in relevant part, that claims brought pursuant to the AMLA must be brought "within two years next after the act, or omission, or failure giving rise to the claim ...; provided further, that in no event may the action be commenced more than four years after such act." In Mobile Infirmary v. Delchamps, 642 So. 2d 954 (Ala. 1994), this Court stated the following general propositions concerning the limitations period set forth in § 6-5-482(a):

> "The limitations period of § 6-5-482 commences with the accrual of a cause of action. Street v. City of Anniston, 381 So. 2d 26 (Ala. 1980); Bowlin Horn v. Citizens Hosp., 425 So. 2d 1065 (Ala. 1983); Ramey v. Guyton, 394 So. 2d 2 (Ala. 1981). A cause of action 'accrues' under § 6-5-482 when the act complained of results in legal injury to the plaintiff. Grabert v. Lightfoot, 571 So. 2d 293, 294 (Ala. 1990); Colburn v. Wilson, 570 So. 2d 652, 654 (Ala. 1990). The statutory limitations period begins to run whether or not the full amount of damages is apparent at the time of the first legal injury. Garrett v. Raytheon Co., 368 So. 2d 516, 518 (Ala. 1979). When the wrongful act or omission and the resulting legal injury do not occur simultaneously, the cause of action accrues and the limitations period of § 6-5-482 commences when the legal injury occurs. Moon v. Harco Drugs, Inc., 435 So. 2d 218, 219 (Ala. 1983); Ramey v. Guyton, 394 So. 2d 2, 4-5 (Ala. 1981)."

642 So. 2d at 958 (emphasis added).

7

The key fact in this case is the time at which Arlene <u>first</u> suffered a legal injury caused by the defendants' alleged failure to discontinue her use of Plaquenil. The following factual allegations concerning the alleged malpractice are taken from the second amended ("the operative complaint"):

> "27. On or about <u>July 10, 2013</u>, [Arlene] presented to the Kirklin Clinic of UAB Hospital … with complaints of joint pain and was seen by Dr. Spalding, a Rheumatologist, who diagnosed [Arlene] with erosive inflammatory osteoarthritis.
>
> "28. Dr. Spalding chose to prescribe a medication called Hydroxychloroquine, also known by its brand name of <u>Plaquenil</u>, in order to treat [Arlene's] diagnosed erosive inflammatory osteoarthritis.
>
> "29. <u>Plaquenil poses a known risk of retinopathy, or damage to the retina, which can lead to severe and permanent vision loss if timely cessation of the drug does not occur</u>. …
>
> "….
>
> "31. <u>Annual screening is required in order to properly screen a patient for Plaquenil retinopathy and must begin no later than five (5) years after a patient has started taking Plaquenil</u>, as long as the patient is receiving a proper dose and does not have any major risk factors for Plaquenil retinopathy. … <u>The goal of screening is to recognize definitive signs of toxicity at an early enough stage to prevent a serious loss of visual acuity</u>.
>
> "….

"46. The risk of harm associated with Plaquenil use increases exponentially with the duration of Plaquenil use. … The risk of harm is low at the beginning of a patient's use of Plaquenil, but that risk increases more severely with each passing year as the patient continues to take Plaquenil.

"….

"51. On or about <u>October 24, 2019</u>, Dr. Martin saw [Arlene] at the Maynor & Mitchell Eye Center. At this visit, Dr. Martin knew, or should have known, that [Arlene] had been taking Plaquenil for over five (5) years and was required to receive, at minimum, both an automated visual field test and an SD OCT [Spectral Domain Optical Coherence Tomography] test every year. Dr. Martin chose not to provide [Arlene] with an automated visual field test, but did perform an SD OCT on [Arlene]. <u>The SD OCT revealed localized thinning of the photoreceptor layers in the parafoveal region of [Arlene's] eyes. Dr. Martin knew, or should have known, that this thinning was a strong indicator of toxicity. Dr. Martin chose to permit [Arlene] to continue taking Plaquenil despite the results of the SD OCT which revealed definitive signs of toxicity</u>. …

"52. On or about <u>November 19, 2019</u>, Dr. Spalding saw [Arlene] at the Kirklin Clinic of UAB Hospital. … Dr. Spalding chose not to discontinue prescribing Plaquenil to [Arlene] despite [the October 24, 2019, SD OCT] ….

"….

"54. On or about <u>October 29, 2020</u>, Dr. Martin saw [Arlene] at the Maynor & Mitchell Eye Center. <u>[Arlene] complained of seeing a glare with headlights and indicated that she no longer drove at night anymore due to her visual acuity.</u> At this visit, Dr. Martin knew, or should have known, that [Arlene] had been taking Plaquenil for over five (5) years, <u>that loss of night vision is associated with Plaquenil</u>

9

retinopathy, and that [Arlene] … was required to receive, at a minimum, both an automated visual field test and an SD OCT test every year. Dr. Martin chose not to provide [Arlene] with either of the two required minimum tests to screen for Plaquenil retinopathy. Dr. Martin chose to permit [Arlene] to continue taking Plaquenil despite the loss of night vision and despite the absence of the required minimum Plaquenil retinopathy screening tests within the past year. …

"….

"59. On or about May 24, 2022, [Arlene] presented to the Kirklin Clinic of UAB Hospital and was seen by Ms. Hill, a Certified Registered Nurse Practitioner ('CRNP'). As a CRNP prescribing Plaquenil … Ms. Hill chose not to discontinue prescribing Plaquenil to [Arlene] despite the absence of the required minimum Plaquenil retinopathy screening tests within the past year. …

"60. On or about November 3, 2022, Dr. Martin saw [Arlene] at the Maynor & Mitchell Eye Center. [Arlene] complained of seeing afternoon glares, seeing blocks of light and dark when reading, having difficulty seeing the TV, and being unable to drive at night. Dr. Martin chose, for the first time, to perform an automated visual field test. Dr. Martin also chose to perform an SD OCT on [Arlene], the first SD OCT since 2019. The automated visual field test revealed visual field defects consistent with Plaquenil retinopathy. The SD OCT revealed significant thinning of the photoreceptor layers in [Arlene's] eyes. Dr. Martin chose to refer [Arlene] to Ophthalmologist [Dr. Alexander Talalight] … for possible Plaquenil toxicity and instructed [Arlene] to stop taking Plaquenil.

"61. On or about December 15, 2022, Dr. Talalight saw [Arlene] at the Retina Centers of Alabama … where she diagnosed [Arlene] has having toxic maculopathy of both eyes due to Plaquenil."

(Emphasis added.)

According to the allegations of the operative complaint, Arlene's use of Plaquenil, which began in July 2013, did not immediately cause a medically identifiable legal injury. Rather, the operative complaint specifically alleges that the "risk of harm associated with Plaquenil use increases exponentially with the duration of Plaquenil use" and that, on October 24, 2019, a Spectral Domain Optical Coherence Tomography test revealed "definitive signs of [retinal] toxicity." In the Morgans' own words, that is the date when Arlene first alleged that she had a medically identifiable legal injury.[3] As indicated, the operative complaint alleges (1) that Arlene was prescribed Plaquenil at some point in July 2013; (2) that there was a known risk that Plaquenil could cause retinopathy or damage to the retina; (3) that annual screening is required to properly

---

[3]Despite the Morgans' allegations that testing showed "definitive signs" of retinal toxicity, they now argue that they could not have reasonably discovered their causes of action within the two-year limitations period set forth in § 6-5-482(a), which provides, in relevant part, that "if the cause of action is not discovered and could not reasonably have been discovered within such period, then the action may be commenced within six months from the date of such discovery …." Thus, the argument they now make on appeal, being contrary to the allegations of the operative complaint, is without merit.

monitor a patient for retinal toxicity and the screening must begin no later than five years after a patient has started taking Plaquenil; (4) that the goal of screening is to recognize definitive signs of toxicity <u>at an early enough stage</u> to prevent a loss of visual acuity; (5) that, on <u>October 24, 2019</u> (six years after beginning to take Plaquenil), testing "revealed localized thinning of the photoreceptor layers in the parafoveal region" of Arlene's eyes, which is a strong indicator of retinal toxicity; and (6) that Arlene was permitted to continue taking Plaquenil despite the results of that testing. Thus, accepting as true the facts as alleged by the Morgans in their operative complaint, their causes of action accrued on October 24, 2019. Despite the allegations of their operative complaint, the Morgans argue that medical negligence in cases involving Plaquenil toxicity occurs "when a patient is not timely taken off of Plaquenil," that the legal injury occurs when a patient "suffers severe vision loss that would have otherwise been prevented had the patient been timely taken off" the drug, and that the "threshold of 'severe vision loss' is ingrained within the medical literature." Answer at 23. Although it is clear from the allegations of the operative complaint that Arlene's symptoms continued to progress or worsen, it is well established that the two-year

12

limitations period and the four-year period of repose set forth in § 6-5-482(a) begin to run when the cause of action accrues, which is the date the <u>first</u> legal injury occurs. <u>See</u> <u>Ex parte Affinity Hosp., LLC</u>, [Ms. SC-2024-0174, Mar. 7, 2025] \_\_\_ So. 3d \_\_\_ (Ala. 2025) (holding that a patient's cause of action manifested when the first signs of infection arising out of a surgical procedure appeared, not when the infection worsened to the point when amputation of the leg was required); <u>Delchamps</u>, 642 So. 2d at 958 (noting that "[w]hether [Delchamps's] claims are barred by § 6-5-482 depends on when in fact she first suffered the alleged legal injury, i.e., the bone degeneration in her jaw"); <u>Cutler v. University of Alabama Health Servs. Found., P.C.</u>, 215 So. 3d 1065, 1073 (Ala. 2016) (plurality opinion) ("[I]t is clear <u>from the allegations of his complaint</u> that Cutler suffered a legal injury 'within the [four] years following [the] June 28, 2005,' MRI, because it is within that time that Cutler alleges the tumor/lesion began its growth process and/or became malignant. Thus, Cutler's argument that his 'legal injury' could not have manifested itself until he actually suffered harm is unavailing."); and <u>Garrett v. Raytheon Co.</u>, 368 So. 2d 516, 520 (Ala. 1979) (noting that the limitations period in a medical-malpractice action begins to run

regardless of whether the full amount of the damage is apparent at the time of the first legal injury).

It is well settled that a plaintiff is the master of his or her complaint and that, in considering a motion to dismiss under Rule 12(b)(6), courts are required to accept the allegations of the complaint as factually true. Those facts are then measured and assessed against the legal requirements to maintain a cause of action. In cases such as this, in which there has been no discovery, the dates and times alleged in the complaint are critical to evaluating whether the applicable statute of limitations bars the cause of action. Because, in this case, the Morgans allege that the first sign of a legal injury manifested on October 24, 2019, their medical-malpractice action, which was commenced almost five years later on October 22, 2024, was commenced well beyond the four-year period of repose set forth in § 6-5-482(a); thus, their action is barred. See Ex parte Hodge, 153 So. 2d at 742 (reiterating that the four-year period of repose set forth in § 6-5-482(a) is an absolute bar to all medical-malpractice claims bought more than four years after the cause of action accrues).

### IV. Conclusion

14

The Morgans have alleged on the face of their operative complaint specific facts demonstrating that their causes of action accrued on October 24, 2019, yet they did not file their original complaint until well beyond the four-year period of repose set forth in § 6-5-482(a); thus, the defendants have demonstrated a clear legal right to orders dismissing the claims against them. Therefore, we grant the petitions for the writ of mandamus filed by the defendants, and we direct the trial court to vacate its orders denying their motions to dismiss and to enter orders dismissing the claims against them.

SC-2025-0275 -- PETITION GRANTED; WRIT ISSUED.

SC-2025-0283 -- PETITION GRANTED; WRIT ISSUED.

Stewart, C.J., and Shaw, Wise, Bryan, Mendheim, Cook, McCool, and Lewis, JJ., concur.